**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

INEZ FINLEY,                                          No.  C 07-00664 SBA

        Plaintiff,                              **ORDER**

   v.                                              [Docket No. 81]

WELLS FARGO BANK,

        Defendant.

_____

**REQUEST BEFORE THE COURT**

Before the Court is defendant Wells Fargo Bank's Motion for Summary Judgement or, in the Alternative, Summary Adjudication of Issues (the "Motion") [Docket No. 81].  Plaintiff Inez Finley has sued Wells Fargo asserting claims for discrimination, retaliation, and a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the California Fair Employment and Housing Act (the "FEHA"), Cal. Gov. Code § 12900, *et seq.*  Finley, an African American, asserts that Wells Fargo treated her worse than non-African-American employees, created a hostile work environment based on her race, and terminated her because of her race and because she complained about her discriminatory treatment.  Having reviewed the parties' pleadings, the Court finds this matter suitable for disposition without a hearing under Federal Rule of Civil Procedure 78(b).  As discussed below, the Motion is GRANTED, as the Court finds that the undisputed evidence shows that Wells Fargo acted for legitimate non-discriminatory and non-retaliatory reasons, and that no hostile work environment existed.

**BACKGROUND**

**I.      Factual History**

    **A.      2005**

        **1.      Finley's Hire and Orientation**

Finley is African American.  In March 2005, Timothy Collins, who is European American and the senior vice president of experiential marketing in Wells Fargo's Enterprise Marketing

Division, interviewed her for a position as his administrative assistant.  Collins hired her in April 2005.  She was his only administrative assistant.  Her job duties included, but were not limited to, answering telephones, sorting mail, scheduling meetings, coordinating his calendar with respect to different time zones, budgeting and accounting his expense reports, reviewing the expenses of his direct reports, disseminating information to the division and staff, and coordinating special events and office functions.

Wells Fargo asserts that during Finley's first week, Grove trained Finley in her duties. Finley claims that Grove spoke with her "a little bit," but that she knew or learned most of her duties on her own.  Finley received new hire orientation and a copy of the *Handbook for Wells Fargo Team Members* (the "Handbook").  On May 20, 2005, she signed a Team Member Acknowledgment (the "Acknowledgment") confirming receipt of the Handbook and a Code of Ethics and Business Conduct (the "Code").  The Acknowledgment specifies that it is Finley's duty to read the *Handbook* "thoroughly and become familiar with its contents" including, but not limited to, the Code, the Equal Employment Opportunity ("EEO") policy and Wells Fargo's expectations relating to job performance and workplace conduct.  Docket No. 84 ¶ 10, Ex. "B."  Finley also acknowledged that her employment was at-will.  *Id.*

### a.  Wells Fargo Policies

Under Wells Fargo's workplace conduct policy, employees are expected to use good judgment and common sense in making work-related decisions and are accountable for their actions. They are expected to treat fellow team members with courtesy, respect, and professionalism. Violations of these policies are grounds for corrective action, including termination.  Examples of violations include "outbursts, yelling, rudeness or annoying conduct that interferes with another team member's ability to perform his or her job."  *Id.* ¶ 9, Ex. "A" §§ 3.1, 3.13.  The policy states that employees are to treat supervisors and managers "with respect, which includes avoiding insubordinate behavior."  *Id.* § 3.13.

Wells Fargo's EEO policy prohibits discrimination and/or harassment based on, inter alia, race and/or color, and bars retaliation for reporting conduct believed discriminatory or harassing. The EEO policy also provides that employees may report such behavior to a supervisor or manager,

or to a human resources consultant and/or Employee Relations at 1-888-284-9147.  *Id.* § 3.12.

### 2.   Finley's Performance

For the first few months after her hire, the parties agree that Finley and Collins had a "pleasant" working relationship.  Dep. at 63:23-24; Docket No. 82, Ex. "D," Ex. "14."  Finley testified, however, that Collins had a temper, and "[s]ometimes he just had bad days."  Dep. at 63:12-15.  He advised her early on that "he was good in the mornings" and if she needed to "get something across, to get it to him in the mornings," and not in the afternoon.  *Id.* at 63:16-21.  Finley tried to do this.  As time went on, however, Collins' "screaming really hindered [their] ability to communicate[,]" because, he would be "in [Finley's] face" with it "and sometimes he would curse." *Id.* at 70.

Collins testified that starting in July 2005, he began to notice that Finley had performance problems.  Among other things, at least once a week she either failed to schedule meetings, mis-scheduled them, or scheduled them when he had conflicts.  As a result, he had to schedule more and more meetings himself.  Also, he became "aware that [she] had difficulty working with co-workers." On July 19, 2005, he met with Finley to discuss her performance issues.  He recommended that she contact Grove regarding any training she might need regarding her duties.  He also expressed concern with "blamestorming," i.e., her blaming others for her mistakes, despite his previously counseling her to focus on solutions, not blame.  Finley became defensive and blamed others for her mistakes.  He documented their meeting in an e-mail to the division's human resources consultant, Amy Welch.

Finley's job performance did not improve.  In October 2005, Collins met with Finley and warned her that she would likely receive a performance rating of "2" for her 2005 Performance Evaluation.  This reflects unsatisfactory performance needing improvement and would make it difficult for her to transfer to another Wells Fargo position.  He let her know prior to her review, so she could transfer to another Wells Fargo position *before* the rating became official.  Prior to this meeting, Finley never complained to anyone at Wells Fargo about Collins for any reason.

On November 7, 2005, Collins was copied on an e-mail from Alvin Chuck, an administrative assistant who reported to a different manager.  After Finley sent Chuck and others a cancellation

3

notice for a regularly occurring meeting, Chuck e-mailed her to "[p]lease delete me from the list QUICKLY[.]"  Docket No. 83 (Decl. of Timothy Collins ("Collins Decl.")), Ex. "M."  Finley replied that she already had, to which Chuck replied, "[w]hat if I come back?!"  *Id.*  Finley responded by asking him to call her to avoid chain replies, and to avoid "certain punctuation marks as it comes across wrong."  *Id.*  Chuck replied "[w]hatever[.]"  *Id.*  Finley replied, "[p]lease do not contact me if you chose to be hostile.  Have a great day."  *Id.*  Chuck replied that she "was the hostile one," that she should direct future communications to his manager, and that when he worked in her division, he found her "one of the most unprofessional admins [he] had ever worked with[.]"  *Id.*  Chuck copied this e-mail to Collins and Welch.  *See id.*  Finley asserts that Chuck then called her, "harassing her."  Dep. at 75.  She also asserts that before reading the e-mail chain, Collins, who was out of town, called her and "went off," calling her paranoid as she always thought that people thought she was rude.  *Id.* at 75-77.  On November 8, 2005, however, Collins said in an e-mail to Welch that he had spoken with all parties and it appeared that Chuck had overreacted.  Collins then apologized to Finley.

Also on November 8, 2005, a dispute occurred between Finley and Patricia Porter, the division's brand manager.  Collins, out of town, called Porter to ask her to find Finley to resolve a scheduling problem, as he could not find her.  Porter says that she found Finley in the break room and "called" to her, to tell her that Collins needed to speak with her.  Decl. of Patricia Porter ¶¶ 3-5.  Finley says that Porter "screamed" at her from the "end of a hallway[.]"  Collins Decl., Ex. "E."  Porter says that Finley began screaming at her that Porter should not yell at her; that her mother used to yell at her when she was young.  Finley claims that she did not scream, as she was so embarrassed, she was speechless, but was able to tell Porter that they were all adults, and not to scream at her.  Alternatively, Finley declares that she yelled at Porter, after Porter yelled at Finley and accused her of being a bad employee.  Other employees stopped what they were doing to watch the disturbance.  Porter did not report the incident, but at least one co-worker, Ann Marie Quinn, contacted Collins and described Finley's behavior as sufficiently "inappropriate" to warrant a report.  Collins confirmed Porter's version of the incident with other co-workers.

Three days later, on November 11, 2005, Collins and Welch met with Finley to discuss a

4

corrective action.  On November 14, 2005, Collins memorialized the meeting in email to Finley.  He notes that a couple of months prior he and Finley met to discuss an incident where she became angry and hung up her telephone on a co-worker.  He also notes that he had recently received more and more negative feedback on her behavior.  Specifically, that her "reaction to simple problems or conversations is often loud and confrontational."  Collins Decl. ¶ 9, Ex. "D."  He also notes that "[m]ore than one person has expressed that they are afraid to be around you."  *Id.*  During this meeting, the parties also discussed Collins' use of profanity.  Welch shortly thereafter followed-up with Finley to confirm that this had ceased.  Finley declares that it never completely ceased.

On November 15, 2005, Finley wrote a rebuttal to Collins' e-mail.  She wrote that "[t]hough I respect Tim's opinion, it's inflammatory and is very much out of context."  *Id.*, Ex. "E."  She claims it was "solely his interpretation" and not shared by their co-workers.[1]  *Id.*  She denies hanging up on a co-worker.  She asserts that he was blaming her to compensate for his inability to deal with issues.  She also notes that earlier that day, the 15th, "Tim had one of his outbursts where he became upset that Admins did not come to a planned Admin meeting," which he loudly proclaimed was "bullshit," before he "stormed away."  *Id.*  She states that she "loves" her job but that Collins has a "flawed way of looking at things."  *Id.*; Dep. at 107:13-108:15, Ex. "6."

**B.      2006**

On or about February 2 and 3, 2006, Collins' team held an "Experiential Marketing Offsite" event.  Finley was responsible for all arrangements, including meals, hotel rooms, meeting rooms, set-up, and collecting presentations.  On February 1, 2006, she called in sick and failed to tell Collins how much work remain uncompleted.  As a result, one presentation went uncollected.  Finley alleges that she told Collins he would have to collect the presentations.  Also, on February 2, 2008, Collins and hotel staff had to do the set-up, because Finley did not arrive until 7:45 a.m., rather than at 7:00 a.m., as instructed.  Finley asserts that she arrived at 7:30 a.m., as instructed.  She claims that when she arrived, Collins publicly berated her, though off to one side, for being late.

On February 7, 2006, at a staff meeting, when each attendee was asked to state how they

---

[1]        In her deposition, she testified that co-workers told her that they were afraid of Collins.

spiced up their life or cooking, Collins joked that he likes to "torture his staff," then discussed a new Emeril cookbook he had purchased.  Dep., Ex. "4" at 9.  Finley found this insensitive.

In February 2006, Finley received an overall performance rating of "2" on her 2005 Performance Evaluation.  She prepared a written rebuttal, stating that she and Collins had "agreed to disagree" about her rating and that he "lacks gratitude and acts as if I've done nothing and deserve a 2 rating."  Dep. at 134:18-135:16, Ex. "9."  She also claims that Collins was "wildly" exacerbating "fictitious events and feedback."  Dep., Ex. "9."

She met with Collins' manager, David King, to discuss her review.  She told King that she felt misunderstood and unappreciated by Collins.  She said that she felt rated for only the things she had not done, while her contributions were overlooked.  King told her that he had reviewed her evaluation and would not change her rating.

In April 2006, Welch reviewed Finley's evaluation and rebuttal.  She deleted a couple of statements by Collins relating to incidents that occurred in 2006, rather than in 2005, but declined to change Finley's rating.  On May 9, 2006, Finley submitted a written rebuttal to her revised review to Collins and Welch.  She states that she disagrees with her rating and is disappointed that her hard work and exceptional efforts are unrepresented.  She never mentions race as a factor in her poor rating.

On May 1, 2006, Finley missed a meeting with Collins and Porter regarding sponsorship interviews.  Finley was supposed to attend, to understand the scheduling issues involved with the interviews.  Finley had agreed to attend, but then failed to notify Collins that she had a conflict.  Collins and Porter waited 20 minutes, before cancelling the meeting.

### 1.    May 9, 2006 Memorandum

On or before May 9, 2006, Finley allegedly wrote a memorandum, addressed only to "Employee Records."  In it, she claims that Collins is more critical of her than her colleagues, all European American, that he disrespects her more than them, and supports her less than them by dismissing her complaints.  *See* Dep., Ex. "14."  She also claims that he publicly criticizes her, to provoke a negative reaction from her, which he does not do to her co-workers, despite their "extreme behavior[.]"  *Id.*  She alleges that her work environment is "strained," "hostile," and

"beyond repair." *Id.*  She claims that "[i]n seeking employment assistance, [she] confided with family and friends . . . [and] the NAACP" and now believes that her disparate treatment has a "considerable racial undercurrent." *Id.*  In closing, she asserts that she may need "medical counseling" and requests "management counseling on how to rectify this hostile work environment . . . ." *Id.*

She placed this memorandum in a stack of loose papers, and gave the stack to Collins, possibly when she gave him his mail, upon his return from a trip.  Neither Collins nor Welch, however, ever saw this document during Finley's employment.  It does not appear in, nor is it attached to, a detailed chronology of events that Finley prepared for the Equal Employment Opportunity Commission (the "EEOC"), on August 23, 2006, shortly after termination.

### 2.    Formal Corrective Action Plan

On May 19, 2006, Finley was placed on a formal corrective action plan.  In the plan, Collins notes that Finley has issues "partnering" with team members, e.g., she could be abrupt, sigh, or adopt a frustrated tone when asked to help.  Collins Decl., Ex. "H" at 1.  He also states that she wears headphones at a volume which prevents her from noticing people when they come to her for assistance.  He notes that after an office move, he directed her to unpack some boxes, but she only unpacked half, letting the remainder sit, rather than request assistance from other administrative assistants to complete the task.  He claims that he had to unpack the boxes with another administrative assistant.  He also states that she sometimes provides the status of a request, but fails to complete it.  He states that she falls asleep in team meetings.  He also alleges that she fails to surmount "roadblocks." *Id.* at 2.  For example, when only able to reserve three meeting rooms for retirement presentations, instead of the requested four, she failed to consider meeting rooms at other Wells Fargo facilities or at hotels.  Likewise, when a short-term contractor was scheduled to start in two days, Finley placed a two-week order for his computer.  Collins immediately transferred a computer from an outgoing contractor to the arriving contractor.

The plan to address these issues was that Finley would behave in a more professional manner towards team members, alert Collins if a deadline needed rescheduling, actively participate in team meetings, and work on developing alternatives when faced with "roadblocks." *Id.* at 2-3.  Collins

notes that in many cases, Finley is the most qualified person to solve an issue.  The plan warns Finley, however, that absent immediate and sustained improvement, if she fails to meet the plan's expectations within 45 days, or July 3, 2006, she will be terminated.  To help Finley meet her goals, Collins set up a weekly meeting with her, unless he was traveling, to review her progress and set next week's goals.

Finley submitted a written rebuttal to the plan.  She disputes almost all of its allegations: if she sighed or was frustrated, this was a trivial matter; her headphones were not loud; all the administrative assistants were supposed to help her unpack, but they declined to; she did not miss the May 1 meeting, but was five minutes late; she provided status reports when necessary, and completed requests; she never fell asleep in any meeting; she procured all required meeting rooms; and she could not control the order time for the contractor's computer.  She states that she feels unappreciated and harassed by Collin's comments.  She does not, however, mention race as an issue.

Finley and Collins met after she submitted her rebuttal.  She wanted to meet, to tell him that she wanted to continue working with him and to discuss goals to achieve, going forward.  In the meeting, they agreed that she could use a different type of headphones, so people could feel they could approach her.  They also agreed that she would work on her tone of voice, and not challenge Collins when he brought it to her attention.  As for being a more active team member, Finley admitted that she "must be missing the mark[,]" and requested Collins to clarify what she needed to do in this regard.  Dep., Ex. "13."  They agreed that she would ask questions and take notes during meetings, and when faced with a problem, try to generate three possible solutions, before seeking Collins' assistance.

### 3.   Termination

On August 4, 2006, Collins sent Finley an e-mail asking why he had not received mail for a week.  Finley became defensive, claiming that she was out for the first two days of the week, and upon her return had determined that there was a problem with the mail delivery.  Collins told her that she should have covered her duties in her absence, and notified him about the problem, as soon as she discovered it.

On August 11, 2006, Collins met with Finley to discuss her job performance.  He told her

that her performance had been strong for the first six to eight weeks, that she set up several key meetings, and had been proactive in solving technical issues.  In the prior few weeks, however, she had lapsed into having problems with team engagement and follow through, and was not meeting expectations.  Collins advised her that although he was taking her off formal warning, her performance was unsatisfactory.  He also warned her that she needed to maintain a consistent standard of excellence, and that any serious shortfall would result in immediate corrective action, including termination.

Three days later, on August 14, 2006, Finley scheduled a senior managers' meeting for a time when neither Collins nor his manager King were available.  She claims that Collins told her to schedule the meeting for when she did, and that he sometimes double-booked meetings.  When Collins tried to discuss the error, she allegedly told him that she had stopped listening to him because he brought her down.  She denies making this statement.  After consulting with Welch and King, Collins decided to terminate Finley's employment, as of August 16, 2006.

## II.    Procedural History

On October 13, 2006, Finley, in propria persona, filed a race discrimination and retaliation charge with the EEOC.  She charges that as the only African American in the division, Collins treated her differently than other employees, only screaming at her and only disciplining her, and giving her different tasks to perform.  She also claims that he refused to approve training for her, but approved it for a less senior European-American employee.  In October 2006, she received a right to sue notice.  On February 1, 2007, she sued Wells Fargo for race discrimination.  *See* Docket No. 1.  She then filed a First Amended Complaint on December 11, 2007.  *See* Docket No. 40.  On May 5, 2008, Finley retained counsel.  *See* Docket No. 58.  By stipulation and leave of Court, *see* Docket No. 74, she filed a Second Amended Complaint (the "SAC"), on September 9, 2008, alleging race discrimination, retaliation, and a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the California Fair Employment and Housing Act (the "FEHA"), Cal. Gov. Code § 12900, *et seq.*, *see* Docket No. 75.

In discovery, Collins denied that Finley ever raised the issue of race with him.  He also declared that he treated her the same as all employees.  Finley testified that Collins used labels for

1   her, like "paranoid," but never made any comments based on race.  Dep. at 77:12-19.  She also

2   testified that she did *not* believe that Collins' refusals to approve her training requests were racially

3   motivated.  On November 11, 2008, Wells Fargo filed the Motion for Summary Judgement or, in the

4   Alternative, Summary Adjudication of Issues (the "Motion") before the Court.  *See* Docket No. 81.

5                                    **LEGAL STANDARD**

6            Summary judgment is appropriate if no genuine issue of material fact exists and the moving

7   party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*,

8   477 U.S. 317, 322-23 (1986).  The party moving for summary judgment must demonstrate that there

9   are no genuine issues of material fact.  *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029,

10  1035 (9th Cir. 2007).  An issue is "genuine" if the evidence is such that a reasonable jury could

11  return a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

12  (1986); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  An issue is "material" if

13  its resolution could affect the outcome of the action.  *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d

14  at 1146.

15           In responding to a properly supported summary judgment motion, the non-movant cannot

16  merely rely on the pleadings, but must present specific and supported material facts, of significant

17  probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith*

18  *Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th

19  Cir. 2002); *Fed. Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001).  In determining whether a

20  genuine issue of material fact exists, the court views the evidence and draws inferences in the light

21  most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of*

22  *the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564,

23  568 (9th Cir. 2004).

24                                       **ANALYSIS**

25  **I.      Discrimination**

26           Finley alleges that Wells Fargo discriminated against her on the basis of her race.  SAC

27  at 4-5.  Section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), prohibits

28  an employer from terminating an employee or otherwise discriminating against them "with respect

1    to his [or her] compensation, terms, conditions, or privileges of employment, because of such

2    individual's race[.]"  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 796 n.4 (1973).  Likewise,

3    the FEHA prohibits employers from discriminating on the basis of race "in compensation or in

4    terms, conditions, or privileges of employment."  Cal. Gov. Code § 12940(a); *Caldwell v.*

5    *Paramount Unified School Dist.*, 41 Cal.App.4th 189, 195, 41 Cal.App.4th 1523E, 48 Cal.Rptr.2d

6    448 (1995).

7          In cases such as this one, where direct evidence of discrimination is lacking, a motion for

8    summary judgment is disposed of under the three-step, burden-shifting *McDonnell Douglas* test.

9    *See McDonnell Douglas*, 411 U.S. at 802 (Title VII); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

10   1054, 1062 (9th Cir. 2002) (same); *Guz v. Bechtel Nat'l Inc.*, 24 Cal.4th 317, 354, 100 Cal.Rptr.2d

11   352 (2000) (FEHA).  As such, Finley has the initial burden to demonstrate a prima facie case of

12   discrimination, which if met, shifts the burden to Wells Fargo to produce evidence of a legitimate

13   non-discriminatory basis for her termination, which if met, shifts the burden back to Finley to prove

14   by a preponderance that Wells Fargo's basis is pretextual.  *See McDonnell Douglas*, 411 U.S. at

15   802-04; *Villiarimo*, 281 F.3d at 1062; *Guz*, 24 Cal.4th at 354-56.

16         **A.      Finley's Prima Facie Case**

17               In the discriminatory discharge context, the plaintiff must show (i) that [she]

18         was within the protected class; (ii) "that [she] was doing [her] job well enough to rule

19         out the possibility that [she] was fired for inadequate job performance"; and (iii) "that

20         [her] employer sought a replacement with qualifications similar to [her] own, thus

21         demonstrating a continued need for the same services and skills."

22   *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1075 (9th Cir. 1986) (quoting *Loeb v.*

23   *Textron, Inc.*, 600 F.2d 1003, 1013 (1st Cir.1979)); *see also Pejic v. Hughes Helicopters, Inc.*, 840

24   F.2d 667, 672 (9th Cir. 1988); *see Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 255 n.4, 102

25   Cal.Rptr.2d 55 (2000) (same burden under the FEHA).

26         The parties do not dispute that Finley meets the first and third requirements for

27   demonstrating her prima facie case.  The parties dispute, however, whether she has met the second

28   requirement.  Wells Fargo notes the numerous problems documented during Finley's term as

1   Collins' administrative assistant, and asserts that this evidence shows that she cannot rule out the

2   possibility that she was fired for inadequate job performance.  Mot. at 12-13.  Finley notes that she

3   disputes that she had the numerous problems asserted by Wells Fargo during her term as Collins'

4   administrative assistant.  Opp'n at 4-5.

5        The Court notes that "[t]he requisite degree of proof necessary to establish a prima facie case

6   for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a

7   preponderance of the evidence."  *Villiarimo*, 281 F.3d at 1062 (quoting *Wallis v. J.R. Simplot Co.*,

8   26 F.3d 885, 889 (9th Cir. 1994)).  That is, the amount of evidence required is " 'very little.' "

9   *Wallis*, 26 F.3d at 889 (quoting *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1111

10  (9th Cir. 1991).  Finley has produced *some* evidence that she was performing an adequate job, and

11  thus has met her *minimal* burden to rule out the possibility that she was fired for inadequate job

12  performance.

13       **B.**     **Wells Fargo's Legitimate Non-Discriminatory Reasons**

14       Once a Title VII or FEHA plaintiff has demonstrated a prima facie case, "[t]he burden then

15  must shift to the employer to articulate some legitimate, nondiscriminatory reason for the

16  employee's rejection."  *McDonnell Douglas*, 411 U.S. at 802; *see Villiarimo*, 281 F.3d at 1062; *Guz*,

17  24 Cal.4th at 355-56.  " '[T]he defendant must clearly set forth, through the introduction of

18  admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a

19  finding that unlawful discrimination was not the cause of the employment action."  *St. Mary's*

20  *Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*,

21  450 U.S. 248, 254-55 & n.8 (1981)); *see Guz*, 24 Cal.4th at 356.  This is merely a burden of

22  production, not proof, as the ultimate burden of persuasion resides with the employee.  *St. Mary's*,

23  509 U.S. at 508;  *Villiarimo*, 281 F.3d at 1062; *Guz*, 24 Cal.4th at 355-56.  The burden is also

24  minimal, as the employer need only articulate, not prove, reasons for its actions.  *Bd. of Trs. of*

25  *Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 & n.2 (1978).  It need not, however, prove a non-

26  discriminatory intent.  *Id.* at 25 n.2.  And courts "only require that an employer honestly believed its

27  reason for its actions, even if its reason is foolish or trivial or even baseless."  *Villiarimo*, 281 F.3d

28  at 1062 (internal quotation marks omitted); *see Guz*, 24 Cal.4th at 358 (reasons need not be "wise or

correct").

Wells Fargo more than meets its *McDonnell Douglas* burden in this matter.  As Wells Fargo notes, the record is replete with documentation evidencing Finley's poor work performance.  Mot. at 14.  Finley began working for Collins in April 2005.  At that time, she was given materials indicating that Wells Fargo does not tolerate behavior such as yelling at co-workers or insubordination.  By October 2005, Collins warned Finley about scheduling problems and blaming others for her mistakes.  He also warned her that she was heading for a performance rating of "2" for 2005.  In November, she screamed at Porter, for trying to locate her, which caused team members to have concerns regarding working with her.  Collins met with her in November 2005 to address these issues, but she viewed his opinions as "inflammatory," "out of context," and shared by no other employees.

In February 2006, she failed to complete all her duties related to an Experiential Marketing Offsite event.  She then received an overall rating of "2" or "unsatisfactory" for her 2005 performance.  Finley labeled this as based on "wildly" "fictitious events."  Despite reviews by King and Welch, however, her rating remained unchanged.  In May 2006, Finley was placed on a formal corrective action plan, in part because of her attitude towards co-workers and her failure to complete assignments.  Finley disputed these allegations.  Regardless, she was warned she had 45 days to show sustained improvement or she would be terminated. She met with Collins and agreed to work on her interpersonal skills and admitted she needed to take certain steps, such as note taking in meetings, to be a more engaged team member.  In August 2006, although Collins took her off formal warning, he warned her that while her first six to eight weeks had shown improvement, the prior few weeks had been unsatisfactory, and that any serious shortfall going forward would result in termination.  After she mis-scheduled a senior managers meeting for August 14, 2006, when neither Collins nor his manager were available, Collins terminated her, effective August 16, 2006.

Finley counters that all this evidence is disputed.  Opp'n at 4-5.  The Court notes that whether it is or not, on this evidence, Wells Fargo has demonstrated "reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."  *See Hicks*, 509 U.S. at 507 (quoting *Burdine*, 450 U.S. at 254-55 & n.8)

1 (emphasis added); *Guz*, 24 Cal.4th at 356.  It has thus met its *minimal* burden of production, not

2 proof, to "articulate some legitimate, nondiscriminatory reason for [its] rejection." *McDonnell*

3 *Douglas*, 411 U.S. at 802; *see Villiarimo*, 281 F.3d at 1062; *Guz*, 24 Cal.4th at 355-56.

4       This conclusion is reinforced by the fact that "where the same actor is responsible for both

5 the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of

6 time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace*

7 *and Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996); *W. v. Bechtel Corp.*, 96 Cal.App.4th 966, 980-81,

8 117 Cal.Rptr.2d 647 (2002) (doctrine applies under the FEHA); *see* Mot. at 15.  Bradley involved a

9 one-year period, but approvingly cited *Lowe v. J.B. Hunt Transportation, Inc.*, 963 F.2d 173 (8th

10 Cir. 1992), which found a two-year period "short" under this doctrine.  *See Bradley*, 104 F.3d at 271.

11 Because Collins hired and terminated Finley within a 16-month period, Wells Fargo is entitled to a

12 strong inference of no discriminatory motive.

13       **C.**     **Finley's Evidence of Pretext**

14       If the employer meets its burden of production, the burden then shifts to the employee to

15 *prove* that the employer's explanation was merely a pretext to conceal discriminatory conduct.

16 *McDonnell Douglas*, 411 U.S. at 804; *Villiarimo*, 281 F.3d at 1062; *Guz*, 24 Cal.4th at 354.  The

17 employees' burden of proof for this step is a preponderance.  *Reeves v. Sanderson Plumbing Prods.,*

18 *Inc.*, 530 U.S. 133, 143 (2000).  The employee burden is also "to raise a genuine factual question

19 whether, viewing the evidence in the light most favorable to them, [the employer's] reasons are

20 pretextual." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000); *see*

21 *Guz*, 24 Cal.4th at 361-62.  An employee may meet this burden by directly showing the employer

22 was more likely motivated by discriminatory intent or indirectly showing the employer's

23 explanation is unworthy of credence.  *Reeves*, 503 U.S. at 143; *Villiarimo*, 281 F.3d at 1062;

24 *Morgan v. Regents of Univ. of Cal.*, 88 Cal.App.4th 52, 68-69, 105 Cal.Rptr.2d 652 (2000).

25 "Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be

26 both specific and substantial." *Villiarimo*, 281 F.3d at 1062; *see Morgan*, 88 Cal.App.4th at 69.

27       Wells Fargo asserts that Finley cannot meet her burden of proof, because she has no

28 evidence.  Mot. at 14-15.  Finley asserts that the issue of whether or not she was terminated because

14

of her race is disputed, and thus, bars summary judgment for Wells Fargo.  Opp'n at 4-5.

The Court notes that Finley misstates the nature of her dispute.  The parties dispute whether Finley's *performance* for Collins' was adequate or not.  The parties do not dispute, however, *whether she was terminated because of her race*, because she has presented no evidence that race played any role in Wells Fargo's decision.  In *none of her meetings* with Collins, King, or Welch, did she ever mention race was an issue.  In *none of her written rebuttals* did she ever raise race as an issue.  In her deposition, she testified that Collins *never made any racial remarks*.  And, she testified that *race played no factor in his decisions* regarding her training requests.  Finley did apparently draft a memorandum on May 9, 2006, which alleges, without any specific support, that Collins treated her differently than her European American co-workers.  This vague unsworn allegation, however, does not create a genuine issue of material fact in the face of her clear testimony, upon which no reasonable fact finder could find that Wells Fargo terminated her because of her race.  *See Anderson*, 477 U.S. at 248.  Finley has thus failed to meet her burden to prove that Wells Fargo's explanation for her termination was merely a pretext to cover up discriminatory conduct.  *See McDonnell Douglas*, 411 U.S. at 804; *Villiarimo*, 281 F.3d at 1062; *Guz*, 24 Cal.4th at 354.  The Court thus GRANTS summary judgment for Wells Fargo on Finley's claim for discrimination.

**II.     Retaliation**

Finley alleges that Wells Fargo retaliated against her because she complained about her racially discriminatory treatment.  SAC at 5-6.  Section 704 of Title VII, 42 U.S.C. § 2000e-3(a), prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ."  *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003).  Likewise, § 12940(h) of the FEHA makes it illegal for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part . . . ."  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1035, 116 P.3d 1123 (2005).  In analyzing retaliation claims under Title VII or the FEHA, the Court proceeds under the *McDonnell Douglas* analysis.  *Stegall*, 350 F.3d at 1065 (Title VII); *Yanowitz*, 36 Cal.4th at 1042 (FEHA).

**A.     Finley's Prima Facie Case**

15

1    To make out a prima facie case of retaliation, Finley must demonstrate "(1) she engaged in a

2    protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link

3    between her activity and the employment decision."  *Stegall*, 350 F.3d at 1065 (quoting *Raad v.*

4    *Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196-97 (9th Cir. 2003)); *Yanowitz*, 35

5    Cal.4th at 1042.  She may establish a causal link by "an inference derived from circumstantial

6    evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and

7    the proximity in time between the protected action and the allegedly retaliatory employment

8    decision.' "  *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988) (quoting *Yartzoff v. Thomas*, 809

9    F.2d 1371, 1376 (9th Cir. 1987)); *Morgan*, 88 Cal.App.4th at 69-70 (discussing the FEHA).

10   Wells Fargo asserts that the evidence fails to show that Finley engaged in a protected

11   activity, because she never followed Wells Fargo's EEO policy in her Handbook by complaining to

12   a supervisor or manager, or to a human resources consultant or Employee Relations.  Mot. at 17-18.

13   It also asserts that her May 9, 2006 memorandum is too vague to serve as a complaint, and that she

14   cannot link it causally to her termination, as it is "undisputed" that Collins never saw it prior to

15   termination.  *Id.* at 18.  Finley disagrees with these assertions.  Opp'n at 5.

16   The Court first notes that the memorandum states that Collins treats her differently than her

17   European-American counterparts.  Further, it states that she has tried to resolve this issue with him,

18   but their "employment relationship is dreadfully strained and the work environment is hostile."  *See*

19   Dep., Ex. "14."  She further states that "[i]n seeking employment assistance, [she] confided with

20   family and friends who have advised [her] of racial traits and practices in the workplace.  [She] also

21   consulted with the NAACP on how to approach racially sensitive situations."  *Id.*  She concludes

22   that "the difference between my co-workers [sic] treatment and mine is disparagingly unequal with a

23   considerable racial undercurrent."  *Id.*  In closing, she requests "management counseling on how to

24   rectify this hostile work environment . . . ."  *Id.*  On its face, the letter clearly states a complaint of

25   racial discrimination.

26   Turning to causation, Finley testified that she gave the May 9, 2006 memorandum to Collins,

27   albeit, shoved in a pile of papers, upon his return from a business trip.  On August 16, 2006, he

28   terminated her, which is an adverse action.  Thus, sixteen months after hire, but only three months

after her complaint, he terminated her.  Although Collins testified that he never saw the memorandum prior to Finley's termination, this does not alter Finley's burden, which is *minimal*, *see Villiarimo*, 281 F.3d at 1062, and only requires her to produce *very little* evidence, *Wallis*, 26 F.3d at 889, causally linking her memorandum and her termination, *see Stegall*, 350 F.3d at 1065; *Jordan*, 847 F.2d at 1376; *Yanowitz*, 35 Cal.4th at 1042.  Given the length of time Collins was in possession of the memorandum and the short time between its receipt and Finley's termination, she has met her burden and has presented a prima facie case of retaliation.

### B.   Wells Fargo's Legitimate Non-Retaliatory Reasons

Once a Title VII or FEHA retaliation plaintiff has demonstrated a prima facie case, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse action.  *Stegall*, 350 F.3d at 1065; *Yanowitz*, 35 Cal.4th at 1042.  Wells Fargo asserts that it should prevail on this step of the *McDonnell Douglas* test for the same reasons that it prevailed on this step for Finley's discrimination claim.  Mot. at 19.  Finley counters with the same counter-arguments that she raised in this step of her discrimination claim.  Opp'n at 5.

In disposing of Finley's discrimination claim, the Court found that Wells Fargo's reasons for its actions were legitimate and non-discriminatory, e.g., that they were reasonably related to Finley's performance issues and job duties.  Because of this relationship, even if Collins was aware of Finley's May 9, 2006 memorandum, the Court finds that Wells Fargo's reasons for its actions were also non-retaliatory.  That is, if believed by the trier of fact, these reasons would support a finding that unlawful retaliation did not precipitate Wells Fargo's actions.  *See Hicks*, 509 U.S. at 507.  Wells Fargo has thus met its minimal burden of production to articulate some legitimate, non-retaliatory reason for its actions.  *See Stegall*, 350 F.3d at 1065; *Yanowitz*, 35 Cal.4th at 1042.

### C.   Finley's Evidence of Pretext

If the employer meets its burden of production, the burden then shifts to the employee to *prove* that the employer's explanation was merely a pretext to cover up retaliatory conduct.  *See Stegall*, 350 F.3d at 1065; *Yanowitz*, 35 Cal.4th at 1042.  The parties merely stand on the same arguments that they raised in the third step of the *McDonnell Douglas* test for Finley's discrimination claim.  Mot. at 19; Opp'n at 5.  The Court has already found that Finley failed to

meet her burden to show by a preponderance of the evidence that Wells Fargo's proffered non-discriminatory reasons for her termination were pretextual.  The Court reached this finding because Finley presented evidence that she repeatedly failed to raise race as an issue in meetings and memoranda, both before and after her May 9, 2009 memorandum, and because she testified that Collins never made any racial remarks nor, from her perspective, decided her requests for training on this basis.  On this evidence, Finley fails to show a retaliatory basis for any of Wells Fargo's actions.  She thus fails to meet her burden to show by a preponderance of the evidence that Wells Fargo's proffered non-retaliatory reasons for her termination are pretextual.  *See Stegall*, 350 F.3d at 1065; *Yanowitz*, 35 Cal.4th at 1042.  The Court thus GRANTS summary judgment for Wells Fargo on Finley's claim for retaliation.

### III.   Hostile Work Environment

Finley alleges that Wells Fargo created a hostile work environment.  SAC at 6-7.  Although not expressly mentioned in Title VII, it is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]' "  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).  Likewise, § 12940(j)(1) of the FEHA makes it illegal for an "employer . . . because of race . . . to harass an employee . . . .  Harassment of an employee . . . shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."  *Aguilar v Avis Rent A Car, Inc.*, 21 Cal.4th 121, 129, 87 Cal.Rptr.2d 132, 980 P.2d 846 (1999) (discussing predecessor § 12940(h)(1)).

In order to survive summary judgment, a non-movant must show the existence of a genuine factual dispute regarding whether subjectively and objectively a hostile work environment existed, and whether their employer failed to take adequate remedial and disciplinary action.  *McGinest*, 360 F.3d at 1112; *see Aguilar*, 21 Cal.4th at 130 (adopting Title VII standard for FEHA harassment claims).

Subjectively, "[i]n determining if an environment is so hostile as to violate Title VII, we

consider whether, in light of all the circumstances the harassment is sufficiently severe or pervasive

to alter the conditions of the victim's employment and create an abusive working environment."

*McGinest*, 360 F.3d at 1112 (internal citations and quotations marks omitted); *see Aguilar*, 21

Cal.4th at 130.  An isolated comment will not suffice, but neither is psychological injury required.

*Id.*  "It is enough 'if such hostile conduct pollutes the victim's workplace, making it more difficult

for her to do her job, to take pride in her work, and to desire to stay on in her position.' "  *Id.*

(quoting *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1462-63 (9th Cir. 1994)); *see Aguilar*,

21

Cal.4th at 130.

       Objectively:

          In determining whether an actionable hostile work environment claim exists,
      we look to "all the circumstances," including "the frequency of the discriminatory
      conduct; its severity; whether it is physically threatening or humiliating, or a mere
      offensive utterance; and whether it unreasonably interferes with an employee's work
      performance."

*Morgan*, 536 U.S. at 116 (quoting *Harris*, 510 U.S. at 23); *see McGinest*, 360 F.3d at 1113; *see*

*Aguilar*, 21 Cal.4th at 130-31 (Conduct cannot be trivial or sporadic; there must be a concerted

pattern of harassment of a repeated, routine, or generalized nature.).  The analysis is made from the

perspective of a reasonable person belonging to the same racial or ethnic group as the plaintiff.

*Morgan*, 536 U.S. at 116 n.10; *see Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 609

n.7, 262 Cal.Rptr. 842 (1989).  "The required level of severity or seriousness varies inversely with

the pervasiveness or frequency of the conduct."  *McGinest*, 360 F.3d at 1113 (quoting *Nichols v.*

*Azteca Rest. Enter.*, 256 F.3d 864, 872 (9th Cir. 2001) (quoting *Harris*, 510 U.S. at 23)); *see Fisher*,

214 Cal.App.3d at 610.

       Finley asserts that in response to her complaints of racially discriminatory treatment, rather

than attempt to resolve them, Wells Fargo instead continued to discriminate against her, and

retaliated against her, such as by placing her on a formal corrective action plan and by terminating

her.  SAC at 6-7.  As a result, she claims that Wells Fargo created a hostile work environment.  *Id.*

1  Wells Fargo responds that its personnel decisions were not discriminatory or retaliatory, but were

2  reasonably related to addressing Finley's performance issues.  Mot. at 15-16.  Wells Fargo also

3  asserts that because Finley fails to show any conduct unrelated to its personnel decisions, such as

4  physical contact or inappropriate comments, she fails to show that a hostile work environment

5  existed.  *See id*.  Finley counters that it is undisputed that she complained about Collins' conduct and

6  that she felt harassed by it.  Opp'n at 6.  She thus concludes that the only dispute is to what extent

7  she felt harassed, which she asserts is a jury question.[2]  *Id.*

8         The Court notes that Finley has not subjectively or objectively shown a hostile work

9  environment.  First, she fails to show that any racial animus motivated any Wells Fargo agent.  *See*

10 *McGinest*, 360 F.3d at 1112-13; *Aguilar*, 21 Cal.4th at 130-31.  This comports with the Court's

11 finding that she fails to show any discriminatory or retaliatory conduct by any Wells Fargo agent.

12 Second, she fails to show any continuous, pervasive pattern of racial slurs and/or physical contact,

13 which would make it more difficult for a reasonable African American woman to do her job, take

14 pride in her work, or desire to stay on in her position.  *See id.*  In fact, in a positive manner, Collins

15 acknowledges in Finley's formal corrective plan that in many instances, she is the most qualified

16 person to solve an issue.  While the parties present evidence that Collins may have had a temper,

17 Finley connects none of his conduct to her race, and in fact testified that he *never made any racial*

18 *remarks*.  Viewing the undisputed evidence and drawing all inferences in a light most favorable to

19 Finley, *see Anderson*, 477 U.S. at 255, no reasonable fact finder could conclude that Wells Fargo

20 created a hostile work environment.  The Court thus GRANTS summary judgment for Wells Fargo

21 on Finley's claim of a hostile work environment.

22 ///

23

24 —————————————

   [2]      Finley also alleges that Wells Fargo has conflated the concept of "harassment" with the
25 concept of a "hostile work environment" and has thus somehow failed to properly move for
   summary judgment on her claim for the latter.  Opp'n at 6.  The Court notes that in *sexual*
26 *harassment cases*, a plaintiff may allege quid-pro-quo *harassment*, or allege physical contact and/or
   inappropriate comments constituting a *hostile work environment*.  *Meritor Sav. Bank, FSB v. Vinson*,
27 477 U.S. 57, 65 (1986); *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 607, 262
   Cal.Rptr. 842 (1989).  Outside of the sexual harassment context, however, there is no legally
28 cognizable concept as harassment distinct from a hostile work environment, as there is no quid-pro-
   quo application of harassment predicated on race, national origin, *et seq*.

1  ///

2  ///

3  ///

4  ///

5  **CONCLUSION**

6       Accordingly, the Court GRANTS defendant Wells Fargo Bank's Motion for Summary

7  Judgement or, in the Alternative, Summary Adjudication of Issues (the "Motion") [Docket No. 81].

8

9       IT IS SO ORDERED.

10       March 9, 2009

11                                            Saundra Brown Armstrong

12                                            United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28